**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER and NATIONAL FAIR HOUSING ALLIANCE,<br><br>    Plaintiffs,<br><br>v.<br><br>THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*,<br><br>    Defendants. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.    This case involves the latest attempt by the U.S. Department of Housing and Urban Development and Secretary of Housing and Development Scott Turner (collectively "HUD" or "Defendants") to gut a decades-long fair housing enforcement apparatus that has dramatically improved equal housing opportunity for all Americans.

2.    In what amounts to the third direct assault on the Fair Housing Initiatives Program ("FHIP"), HUD seeks to eliminate the primary source of funding for over 100 private nonprofit fair housing enforcement organizations throughout the country (the funding recipients enumerated by law) and instead channel huge sums to a few entities favored by Defendants (which are not intended recipients specifically defined in the authorizing statute).

3.    HUD's plans for the Fiscal Year 2025 ("FY2025") and Fiscal Year 2026 ("FY2026") FHIP appropriations were revealed on July 2, 2026 in notices soliciting funding applications. Although the text and purpose of the authorizing provision in the Fair Housing Act

("FHA")[1] show that fair housing organizations are the dedicated recipients of FHIP awards, the July 2 notices show that HUD is fundamentally altering the program. HUD's restructuring of FHIP will exclude nearly all existing fair housing organizations from FHIP awards and will significantly undermine the chances of those still eligible to apply. This structure will inevitably decrease fair housing enforcement and education work in direct contravention of the FHA.

4.      Congress designed and codified FHIP to support a nationwide network of fair housing organizations and other entities dedicated to preventing and eliminating discriminatory housing practices. In so doing, Congress wrote that "the proven efficacy of private nonprofit fair housing enforcement organizations and community-based efforts makes support for these organizations a necessary component of the fair housing enforcement system." § 905, 106 Stat. at 3869. Congress declared the work of these organizations as necessary—not optional, not interchangeable, and not subject to political whim.

5.      For nearly forty years, across seven different presidential administrations, HUD used FHIP appropriations to seed and support a diverse array of nonprofits focused on eliminating housing discrimination, enforcing the FHA, and promoting fair housing. Today, there are more than 100 fair housing organizations across the country, faithfully carrying out the purpose of FHIP.

6.      Fair housing organizations investigate meritorious fair housing claims, weed out non-meritorious complaints, collect evidence, resolve disputes between housing providers and consumers, counsel consumers, advise the housing industry, implement remedies, and educate governmental entities. In short, fair housing organizations make FHA protections real in

---

[1] The Housing and Community Development Act of 1992 amended the FHA to include FHIP. *See* Pub. L. No. 102-550, § 905, 106 Stat. 3868-3872 (Oct. 28, 1992) (adding 42 U.S.C. § 3616a to the FHA, 42 U.S.C. §§ 3601–3619). Plaintiffs accordingly refer to FHIP as part of the FHA.

communities throughout the nation and these organizations have been critical to fulfilling Congress's directives for nearly four decades.

7.      The FHA specifies what grants shall be made when FHIP funds are appropriated, what fair housing activities are encompassed within each type of grant, and who is eligible for FHIP funding. FHIP's chief focus is fair housing enforcement, and the first type of grant enumerated in the statute is the Private Enforcement Initiative ("PEI"), which is the bread-and-butter grant to fund experienced fair housing organizations to undertake intake, investigation, and other core enforcement activities. The FHA also enumerates the Education and Outreach Initiative ("EOI"), which serves the core FHIP purpose of educating the general public about fair housing rights and responsibilities, and the Fair Housing Organization Initiative ("FHOI"), which builds organizational capacity and can be used to start new fair housing organizations.

8.      For nearly every year of FHIP's existence, HUD has funded all three categories. On average, two-thirds of the annual FHIP appropriation goes to PEI awards, a quarter to EOI awards, and the remaining to FHOI. These allocations have kept with Congress's expectations each year as set forth in agency budget requests and in congressional committee reports. And for decades, FHIP has been working exactly as Congress contemplated: HUD has funded a network of organizations dedicated to fair housing enforcement and education in the communities they serve throughout the country.

9.      HUD's July 2 issuance of Notices of Funding Opportunity ("NOFOs") for the FY2025 and FY2026 FHIP appropriations radically and unlawfully restructure the program.

10.      The changes in the NOFOs have the purpose and effect of disqualifying and/or disadvantaging fair housing enforcement organizations in direct contradiction of the law. For the first time since the creation of FHIP, the FY2025 NOFO provides *zero* funding for PEI and EOI

grants, which have always been the focus of FHIP. Instead, the NOFO contemplates using $46 million of the $56 million in the FY2025 appropriation for just five FHOI awards, one of which will be a staggering $25 million given to a single favored law school. The remaining $10 million of the FY2025 appropriation will be for an Administrative Enforcement Initiative award to a state or local agency, even though such agencies are separately funded through the Fair Housing Assistance Program (FHAP) and have not been allocated FHIP funds since 1995.

11.    The NOFOs also: introduce new eligibility criteria that will disqualify nearly all existing fair housing organizations (i.e., criteria that will bar the very recipients identified in the FHA and its implementing regulations); overhaul the merit review process in a way that disfavors existing fair housing organizations (if any are eligible to apply); introduce subjective components to the "risk review"; and require recipients to comply a with a host of vague, inapposite, and potentially unlawful executive orders.

12.    Because the FY2025 appropriation will not go to the statutorily-enumerated fair housing organizations for core education and enforcement activities, the result of the NOFOs will be a steep and immediate drop in fair housing work across the country. This is antithetical to the wishes of Congress. Nor is there relief on the horizon. Although the FY2026 NOFOs contemplate PEI and EOI awards, they will not start until July 1, 2027 and many fair housing organizations will not survive the wait.

13.    The FY2025 NOFO also does not provide funding for the second and third years of ongoing multi-year PEI awards, even though HUD ordinarily and regularly sets aside a portion of the annual FHIP appropriation for this purpose. Dozens of existing PEI recipients have just ended the first or second year of a three-year grant and are languishing in funding gaps, even though PEI awards are meant to provide year-to-year funding stability. While the FY2026

NOFOs cover ongoing PEI awards, those funds need not be obligated until September 30, 2027, resulting in the exact funding gaps that the multi-year format is designed to prevent.

14. The FY2025 and FY2026 NOFOs are contrary to law and in excess of statutory authority because they use FHIP money in a way that frustrates the program's authorizing statute and departs from Congress's expectations in appropriating the money. Instead of continuing to support and expand fair housing organizations in communities around the country, the NOFOs limit local fair housing work. Most fair housing organizations will be forced to curtail or stop entirely their enforcement work and educational activities, and many will be forced to close. These outcomes necessarily diminish fair housing enforcement and education in direct contravention of the FHA's text and purpose.

15. The FY2025 and 2026 NOFOs are also arbitrary, capricious, and an abuse of discretion because HUD has not provided a reasoned explanation for its dramatic restructuring of a well-established funding program. HUD provides no rationale for defunding the organizations that handle roughly seventy-five percent of all the nation's fair housing complaints and that lead the way in providing critical fair housing education. The scant justifications in the NOFO are unsupported, readily disprovable, and/or at odds with the statutory scheme.

16. HUD also failed to account for the significant reliance interests at stake. For decades, HUD has treated FHIP—and PEI grants in particular—akin to an entitlement program, awarding funds to many of the same recipients year after year to allow increased continuity. This approach has worked: it has resulted in dozens of fair housing organizations, representing the majority of states, centering their activities around FHIP-funded work. These organizations will be devastated by their ineligibility for FY2025 FHIP awards, the wait for potential FY2026 awards, and by the other changes to the program.

17.    The FY2025 and FY2026 FHIP structure that HUD has proposed would be catastrophic for the very organizations that Congress intended to support and for the housing consumers that the FHA is designed to protect, and there is no indication that HUD has afforded these consequences any consideration whatsoever. FHIP recipients often operate in states where no other organization engages in such work, and many serve communities that are often overlooked and underserved: rural areas, low-income neighborhoods, urban areas, veterans, and people with disabilities. Depriving these organizations of their funding will harm the clients and communities they serve.

18.    HUD's latest attack on FHIP follows its arbitrary and illegal attempt to abruptly cancel seventy-eight existing FHIP grants in February 2025 (an attempt blocked by a federal district court) and its failure to award new FHIP grants in spring and summer of 2025 (a delay ended by a federal district court).

19.    Plaintiffs here are the Massachusetts Fair Housing Center ("MFHC") and the National Fair Housing Alliance ("NFHA"), both of which are among the fair housing organizations harmed by the NOFOs.

20.    In a typical year of FHIP funding, Plaintiff NFHA would apply for and/or receive funding in all three categories (PEI, EOI, and FHOI). The FY2025 NOFO eliminates the possibility of NFHA or any other organization receiving PEI or EOI funds and likely renders NFHA ineligible for FHOI funds as well. NFHA's current PEI grant year concludes on July 31, 2026, but without PEI funds provided for in the FY2025 NOFO, NFHA may have to go over a year without funding for its enforcement initiatives.

21.     NFHA is also a membership organization for fair housing organizations across the country, many of whom will be shut out of FHIP funding that they otherwise would have secured and irrevocably harmed by the FY2025 NOFO.

22.     Plaintiff MFHC is one such NFHA member. MFHC has a PEI grant expiring this August and, in the ordinary course, would have sought a new PEI grant to start when the current one ends. Now, MFHC cannot apply for any FY2025 PEI or EOI funding. The FHOI funding provided in FY2025 is not suited for a fair housing organization such as MFHC and the size of the grants in the NOFOs dwarf MFHC's existing budget, rendering the organization ineligible. MFHC does not have the resources to wait for FY2026 funding, and even if it did, the same eligibility criteria are likely to disqualify the organization.

23.     The FY2025 and FY2026 NOFOs constitute final agency action in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*, because they are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority.

24.     Plaintiffs seek an order vacating and declaring the FY2025 and FY2026 NOFOs unlawful; directing HUD to expend the FY2025 and FY206 FHIP appropriations as required by law; and to the extent necessary, order the FY2025 appropriation to remain available after September 30, 2026.

**JURISDICTION AND VENUE**

25.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the APA, and because Defendants are a United States agency and an officer thereof, 28 U.S.C. § 1346(a)(2).

7

26.    Venue is proper because this is an action against an officer or employee of the United States in his official capacity and an agency of the United States, and Plaintiff MFHC resides in this judicial district. 28 U.S.C. § 1391(e)(1).

27.    This Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent statutory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

**PARTIES**

23.    Plaintiff NFHA is a national, nonprofit public service membership organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. NFHA was established in 1988, and it leads a coalition that works to build inclusive, well-resourced, and resilient communities; expand equitable opportunities; and end housing discrimination. NFHA operates several programs to realize this important mission: housing and community development, education and outreach, responsible AI, member services, public policy and advocacy, compliance and technical assistance, counseling and referral, and enforcement initiatives. NFHA has approximately 163 private, nonprofit member organizations throughout the country, many of which are eligible for and regularly receive FHIP funding. NFHA is about to complete the second year of a three-year PEI award. NFHA expected to receive funding for the third year of its PEI award from the FY2025 appropriation, but that is not contemplated by the NOFOs, nor has HUD started the process for providing such funding. NFHA also intended to apply for FY2025 FHOI and EOI awards, but HUD has rendered NFHA unlikely to receive the former and eliminated the latter.

24.    Plaintiff MFHC is the oldest fair housing center in Massachusetts. A nonprofit organization with its principal place of business in Holyoke, Massachusetts, it serves Berkshire,

Hampden, Hampshire, Franklin and Worcester Counties. For more than thirty-five years, MFHC has worked to eliminate housing discrimination and promote equal access to housing through community legal education and outreach, housing mobility counseling, civil rights investigations, individual legal representation, impact litigation, and public policy advocacy. MFHC is in its final year of a three-year PEI grant and intended on applying for another PEI grant from HUD's FY2025 appropriations.

25.     Defendant HUD is an executive branch agency of the United States government. It is charged with administering a variety of federal housing programs, including the Fair Housing Initiative Program grants at issue in this Complaint.

26.     Defendant Scott Turner is sued in his official capacity as the Secretary of HUD.

## FACTUAL BACKGROUND

**Congress's Establishment of FHIP**

27.     Since the FHA was passed in 1968, nonprofit organizations devoted to fair housing have played a pivotal role in making the statute's protections real. Throughout the country, these fair housing groups help individuals and families avoid homelessness, stave off evictions, find safe places to live, ensure that their homes are accessible, and seek redress for discrimination. In addition, fair housing organizations are uniquely situated to root out and redress systemic discrimination through testing and other investigative tools, as well as to educate their communities about fair housing rights and responsibilities.

28.     During the 1970s and 1980s, fair housing organizations endeavored to advance the principles and goals of the FHA with minimal resources. The House Report on the Fair Housing Amendments Act of 1988 noted that "fair housing organizations are burdened with primary enforcement responsibility" for the FHA, but they lacked sufficient resources to carry

9

this burden. H.R. Rep. 100-711 at 15–16 (1988), *reprinted in* 1988 U.S. Code Cong. Admin. News 2173, 2176–77 (footnotes omitted).

29.     Beginning in 1987, fair housing groups worked with HUD to develop a program that would provide direct funding to qualified, private, nonprofit fair housing organizations to conduct fair housing education programs and to perform intakes, testing, investigations, conciliation, and/or litigation of verified complaints of housing discrimination to increase the effectiveness of the FHA. With support from the Reagan administration and leadership from the House and Senate, Congress approved a $3 million pilot of FHIP in the Housing and Community Development Act of 1987. The initial program was extended for two more years in 1990.

30.     Recognizing "the proven efficacy of" fair housing organizations that were serving as "a necessary component of the fair housing enforcement system," § 905(a)(9), 106 Stat. at 3869, Congress amended the FHA to provide sustainable support for these organizations. Congress authorized FHIP funds to implement testing programs; establish new fair housing organizations or expand capacity of existing ones; conduct special projects to respond to new or sophisticated forms of housing discrimination; undertake larger, long-term enforcement activities through multi-year funding agreements; bring enforcement actions to ensure compliance with the FHA; and undertake education and outreach campaigns. *See* 42 U.S.C. § 3616a.

31.     The Senate Report noted that "Under FHIP, private fair housing organizations work within local communities nationwide to promote fair housing through education, outreach, litigation, conciliation, and research into the nature, extent and effects of housing/lending discrimination." S. Rep. No.102-332, at 98 (1992).

32.     Since the 1992 amendment of the FHA, fair housing groups have remained critical to enforcing fair housing laws. The U.S. Government Accountability Office noted the

effectiveness of the fair housing organization model in a comprehensive analysis of FHIP in 1997,[2] and in 2011, a HUD study concluded that FHIP grantees add enormous value to the agency:

> When FHIP grantee organizations are the first point of contact for a complainant, the organization adds value in two ways: First, FHIP grantee organizations weed out cases that are not covered by civil rights statutes, as well as those cases in which the organization's investigations show a complaint lacks merit. This vetting saves resources for HUD and state agencies that do not have to investigate these cases. Second, the investigative evidence provided to HUD and state agencies for a complaint on which a FHIP grantee organization has signed on as a complainant or representative adds merit to those cases. These are the cases that are much more likely to end in a conciliation or cause finding than are other cases in which the complainant comes directly to HUD and state agencies. Of particularly high value is testing evidence, which is limited almost exclusively to the cases that involve a FHIP grantee organization.[3]

33.     The purpose of FHIP awards is twofold: to fund "programs or activities designed to obtain enforcement of the rights granted by" the FHA, and to fund "education and outreach programs designed to inform the public concerning rights and obligations" under the FHA. 42 U.S.C. § 3616a(a). The FHA specifically contemplates that FHIP activities will be accomplished through awards to private, nonprofit fair housing organizations. *Id.*

34.     For PEI awards, the FHA provides that "[t]he Secretary shall use funds made available under this subsection to conduct, through contracts with *private nonprofit fair housing enforcement organizations*, investigations of violations of the rights granted under [the FHA], and such enforcement activities as appropriate to remedy such violations." 42 U.S.C. § 3616a(b)(1) (emphasis added). The Secretary shall use funds "to conduct, through contracts

---

[2] U.S. Gov't Accountability Off., GAO/RCED-97-67, Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program (1997) (hereinafter "1997 GAO Report").

[3] U.S. Dep't of Hous. and Urban Dev., Office of Policy Dev. and Research, Study of the Fair Housing Initiatives Program (2011) at iii, available at https://www.huduser.gov/publications/pdf/fhip_2011.pdf (hereinafter "2011 HUD Study").

with private nonprofit fair housing enforcement organizations, a range of investigation and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination" that violate the FHA. *Id.* at (b)(2). These investigation and enforcement activities include testing, technical assistance to local fair housing organizations, and funding for litigation costs. *Id.*

35.     For FHOI awards, the FHA provides that "the Secretary shall use funds made available under this section to enter into contracts or cooperative agreements with qualified fair housing enforcement organizations, other private nonprofit fair housing enforcement organizations, and nonprofit groups to build their capacity to provide fair housing enforcement." 42 U.S.C. § 3616a(c)(1). In addition, "[t]he Secretary shall use funds made available under this section to help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected classes exist." *Id.* at (c)(2).

36.     For EOI awards, the FHA provides that "the Secretary shall establish a national education and outreach program" for fair housing groups and other "nonprofit organizations representing groups of persons protected under" the FHA to conduct education and outreach to prevent or eliminate discriminatory housing practices. *Id.* at (d)(1). The statute further mandates that the Secretary "shall establish or support education and outreach programs at the regional and local levels," and "shall provide funding to . . . support community-based education and outreach activities." *Id.* at (d)(2)–(3).

37.     The FHA requires the Secretary to submit an annual report to Congress regarding implementation of the FHIP program. This report requires, among other things, "a list of all fair housing enforcement organizations funded under this section during the preceding fiscal year, identified on a state-by-state basis." 42 U.S.C. § 3616a(j)(3).

38.     For over a decade, HUD has used FHIP appropriations for multi-year PEI awards, generally in three-year increments. These awards are like entitlements, in which the grant continues year to year as long as the recipient performs well and Congress appropriates funds. EOI and FHOI grants, on the other hand, are highly competitive. For those categories, fair housing organizations compete for twelve- or eighteen-month awards and receive funding when they demonstrate skill and expertise.

39.     Congress also defined the primary recipients of FHIP awards: qualified fair housing organizations (which must have at least two years of experience with enforcement activities like those funded by PEI awards and be engaged in such work at the time of the application) and fair housing organizations (which, at the time of the application, must have at least one year experience with and be currently engaged in the kinds of work funded by PEI awards). Id. § 3616a(h)(1)–(2); *see also* 24 C.F.R. §§ 125.103–104.

40.     The FHA restricts eligibility for PEI grants to fair housing enforcement organizations, and HUD regulations restrict eligibility for PEI grants to qualified fair housing organizations—those that have been engaged in intake, investigation, testing, and enforcement activities for at least two years and that are actively engaged in such activities at the time of the application—and to organizations with comparable enforcement experience. *See* 42 U.S.C § 3616a(b); 24 C.F.R. § 125.401. In other words, under the FHA, an organization must have engaged in enforcement work for at least a year to apply for a PEI grant.

41.     The HUD regulations also specify that "FHIP funding is made available in accordance with the requirements of the authorizing statute (42 U.S.C. 3616 note), the regulation in this part, and Notices of Funding Availability (NOFAs), and is awarded through a grant or other funding instrument." 24 C.F.R. § 125.104(c).[4]

**FHIP Work Protects Fair Housing Rights Throughout the Country**

42.     For nearly four decades, HUD has used FHIP funds to foster a network of dedicated fair housing organizations. These organizations, in turn, have used their FHIP awards to provide boots-on-the-ground fair housing services within their communities.

43.     FHIP PEI grants historically have enabled private fair housing organizations to provide vitally important, and at times life-saving, services and supports to victims of discrimination. Fair housing organizations are currently supporting survivors of domestic violence; veterans managing PTSD or who need wheelchair accessible housing; children and adults who have been sexually assaulted by a housing provider; senior citizens facing foreclosure; families facing eviction because they have children; home seekers denied housing access because of their race or national origin; people who are physically or otherwise harassed because of their race, national origin, gender, or other characteristics; and so many others.

44.     Activities carried out with FHIP EOI grants also have long played an important role in combating discrimination. Grant recipients use these funds to educate the public, housing providers, government officials, tenant and consumer groups, and others about fair housing rights and stake out a visible presence in their communities so that discrimination, when it occurs, is more likely to be reported. HUD's own research shows that most people who experience discrimination never report it. In Plaintiffs' experience, the most frequent reasons

---

[4] The NOFAs referenced in the regulations are now called NOFOs.

14

given for not reporting housing discrimination are that the victim did not know the law or how to report the issue. NFHA also often hears that people do not recognize signs of discrimination. Grant recipients use FHIP EOI grant money to arm consumers with information. They also conduct trainings on best practices to avoid discrimination.

45.    For example, NFHA member the Intermountain Fair Housing Council (IFHC) serves all counties in Idaho. IFHC counsels clients on their housing options, refers them to potential housing, educates them on rights under the fair housing laws, and helps them resolve discrimination disputes or file complaints; it provides eviction defense services; it offers education and outreach to housing providers and their agents; and it engages in large-scale investigations of discriminatory housing practices, including through testing.

46.    The IFHC fulfills the critical purpose identified in § 3616a(c) of providing fair housing enforcement in an area that is underserved by fair housing groups—its Idaho service area includes many rural communities, immigrant communities, and communities with large concentrations of people with disabilities, sometimes because of their age and veteran status. In many places where it works, the IFHC is the only fair housing legal service provider, and to date, it has conducted 50,000 intakes.

47.    Because it serves a community with few fair housing enforcement resources, the IFHC uniquely meets a need for both individual and system-wide services: it is the only nonprofit organization currently accepting new clients in eviction cases in its service area, and it receives referrals from legal aid service organizations that are not taking new clients. It is also the only fair housing organization in the state investigating fair housing violations and advocating for relief for people who face housing discrimination.

48.     As of early 2025, the IFHC had an annual operating budget of less than $1 million, approximately 90% of which came from HUD funding. With some of its recent FHIP funding, IFHC assisted community members in identifying fair housing matters, conducted intakes, assisted in complaint filing and dispute resolution, trained community members, engaged in collaborative consortium meetings, and conducted testing and other systemic investigations.

49.     IFHC also used recent FHIP awards to conduct fair housing education and outreach programming, including creating and distributing resource guides. For example, because of the prevalence of wildfires and other natural disasters in Idaho, the IFHC had been creating a Disaster Planning guide to give information to people with disabilities on evacuation and disaster preparedness. It also provided fair housing trainings in Spanish and American Sign Language.

50.     HUD has repeatedly praised the IFHC for its work; since 2020, it has received exclusively "excellent" grades from HUD for its performance under the grants.

51.     Another NFHA member, Fair Housing Council of South Texas (FHCST), has similarly leveraged FHIP awards to make a meaningful difference in its region. FHCST has a mission of promoting equitable housing opportunities; engaging in efforts to address discriminatory housing practices; and advocating for open, accessible, and inclusive communities across South Texas. For nearly thirty years, it has furthered this mission through complaint investigation, testing, counseling services, advocacy, mediation efforts, enforcement actions, outreach activities, and educational trainings.

52.     As of early 2025, about 85% of FHCST's $500,000 annual operating budget was supported by a PEI award, which covered all aspects of FHCST's work, including its work on

16

behalf of survivors of domestic violence, people with disabilities, people facing eviction because of their membership in FHA-protected classes, and large-scale investigations involving systemic discrimination based on FHA-protected classes. Under the grant, FHCST was tasked with providing guidance and counseling on discriminatory housing practices to community members, conducting intakes, assisting in complaint filing and dispute resolution, building and maintaining a robust testing program and conducting complaint-based systemic testing investigations, and providing broad outreach and education services to individuals in protected classes as well as to housing providers and professionals.

53.     FHCST has received consistent praise from HUD for its work under FHIP grants, literally serving as a model recipient. For years, HUD has given FHCST exclusively "excellent" ratings during its FHIP assessment reviews and often refers staff from other FHIP organizations in its region to contact FHCST for guidance on fair housing activities and grant reporting.

54.     The second year of FHCST's FY2023 PEI award is ending this month, and the organization ordinarily would have received monies from the FY2025 appropriation to fund the third year of its PEI grant. To date, however, HUD has not started negotiations for the next grant year. If HUD does not use any FY2025 funds for continuing PEI awards and instead draws from the FY2026 appropriation, then FHCST may have to wait another year to continue its award. In the meantime, FHCST is not eligible for the FY2025 FHOI awards, nor is it eligible for a FY2026 PEI award.

55.     Fair housing organizations like NFHA, MFHC, IFHC, and FHCST process the majority of fair housing complaints across the country, over half of which concern complaints related to disability. Discrimination related to familial status and sex together tend to account for over 10% of complaints.

56.     According to NFHA's analysis of federal data and information from more than eighty fair housing organizations, fair housing organizations processed more than 32,000 complaints in 2024 alone, representing 74% of fair housing complaints that year, compared to just 20.9% by FHAP agencies, 4.85% by HUD, and 0.14% by the Department of Justice ("DOJ").

57.     This analysis is consistent with other years, showing how integral fair housing organizations are to FHA enforcement. In NFHA's analysis of more than 330,000 fair housing complaints from 2014 through 2024, fair housing organizations handled over 72% of complaints compared to approximately 21% by FHAPs, 5.5% by HUD, and 0.13% by DOJ.

58.     If most fair housing organizations must stop their enforcement work due to the lack of PEI funding, or have to close entirely, then HUD, DOJ, and state FHAPs will be flooded with complaints they cannot handle, and HUD will be leaving the overwhelming majority of discrimination victims without recourse. HUD's enforcement office has lost a huge number of employees in the last eighteen months, meaning that there will not be adequate staff to manage the influx.

59.     HUD's directory of fair housing organizations indicates that there are more than 150 FHIP recipients in forty-five jurisdictions, including Puerto Rico and the District of Columbia.

**The FHIP Appropriation and Award Process**

60.     The appropriation and obligation of FHIP funding usually follows a standard process.

61.     In advance of Congress's enactment of appropriation legislation, HUD provides Congress with a detailed funding request, known as a Congressional Budget Justification

("CBJ"). HUD's CBJs are plain-language explanations for what funding the agency requests, how that funding will be used, core priorities and performance goals, a summary of past performance, and proposed text for the appropriation legislation.

62.     HUD typically addresses FHIP funding in the portions of its CBJs pertaining to the office of Fair Housing and Equal Opportunity ("FHEO"), which is the office under which FHIP is housed. FHEO is charged with administering the FHA and other federal civil rights laws, and for establishing policies related to the same.

63.     The congressional subcommittees on Transportation, Housing, and Urban Development also routinely issue reports addressing how FHIP funding should be used as part of the appropriation process.

64.     When Congress appropriates funds pursuant to § 3616a, consistent with the requirements set forth in the FHA, HUD undertakes a budgeting and planning process, which includes establishing NOFO forecasts, obtaining clearance, and publishing approved NOFOs.[5]

65.     Before a NOFO is published, Office of Management and Budget ("OMB") regulations require HUD to create an Assistance Listing. An Assistance Listing is a posting in a public government database maintained by the General Services Administration that describes the grant program's statutory requirements, eligibility requirements for applicants, program goals, estimated funding for the program and source of funds, and how the agency intends to measure progress. 2 C.F.R. § 200.203(b).

66.     The NOFOs "announce amounts available for award, eligible applicants, and eligible activities, and may limit funding to one or more of the Initiatives." 24 C.F.R.

---

[5] U.S. Dep't of Hous. and Urban Dev., HUD Exchange, Grants Management Lifecycle, available at https://www.hudexchange.info/onecpd/assets/Image/Grants-Management-Lifecycle-HUD.jpg.

§ 125.104(d); *see also* 2 C.F.R. § 200.204.[6] FHIP NOFOs also "include the specific selection criteria for awards, and will indicate the relative weight of each criterion." *Id.* NOFOs also include instructions for applicants about the funding process and how to apply. *Id.*

67.     Absent exigent circumstances, funding opportunities should remain open for at least sixty days. 2 C.F.R. § 200.204(b).

68.     Following publication of a NOFO, eligible applicants may submit applications up to a designated deadline. HUD then has a duty to "execute" the competitive merit review process it has set forth in the NOFO to select grant recipients. *See* 2 C.F.R. § 200.205.

69.     Once the submission window has closed, HUD convenes a Technical Evaluation Panel to provide a sound, impartial, and comprehensive evaluation of applications consistent with the guidelines of the applicable NOFO. HUD undertakes an initial screening, known as the threshold or intake review. During the threshold review, HUD sets aside ineligible applications and informs those applicants.

70.     Applications meeting the minimum eligibility requirements move forward to panel review in accordance with the NOFO rating factors. HUD may contact applicants during the review process to clarify application items or identify deficiencies for the applicant to cure.

71.     Among the materials that HUD reviews during the selection phase are a narrative about the applicant's capacity and experience; a narrative about the need for the grant work; a budget; a statement of work; a narrative about achieving results and measuring progress; and various certifications.

---

[6] The OMB has issued a notice of proposed rulemaking to amend the federal regulations that currently govern FHIP applications and awards. The OMB's contemplated effective date was October 1, 2026.

72.    Upon completion of its evaluation, HUD selects recipients and secures internal approvals. HUD then assigns and commits funds for the awards.

73.    The FHA requires HUD to notify Congress of the awards at least thirty days before entering into grant agreements. *See* 42 U.S.C. § 3616a(e).

74.    HUD then issues a grant agreement or Notice of Award to recipients. The recipients and HUD enter a negotiation phase, during which they finalize the documents submitted as part of the application process. HUD and awardees agree upon all required administrative and program tasks outlined in the approved statement of work, all costs outlined in the approved budget, the period of performance for the grant, the approved payment schedule, and a start date.

75.    The agreement between HUD and each FHIP recipient—and the formal obligation of appropriated funds—is usually reflected in an Assistance Award, known as a HUD-1044, which is signed by both the recipient and by HUD. For multi-year grants, a HUD-1044 must be finalized for each grant year in the period of performance.

76.    HUD usually finalizes all grant agreements shortly after selecting FHIP recipients, often within two to four weeks. Recipients then report on their grant work, while HUD monitors performance and approves payment.

**HUD's Historical Approach to FHIP Funding**

77.    Consistent with Congress's stated goal of expanding fair housing enforcement "nationwide," S. Rep. No. 102-332, at 98 (1992), HUD has deployed FHIP funding to develop a reliable and geographically diverse network of fair housing organizations. Many of these organizations exist because of FHIP and are structured around the program.

78.      FHEO has divided the country into ten regions. By 2011, "organizations that received a FHIP award were located in nearly every HUD region and in every state."[7] In addition to the program's broad reach, HUD had awarded FHIP funding in a way that ensured no one area received a disproportionate amount. In the first two decades of FHIP, none of the ten regions had received over 20% of the number of FHIP awards made or more than 23% of the dollar amount of FHIP awards made.[8]

79.      Each year, HUD makes dozens of awards to dozens of unique organizations. For example, in FY2024, HUD made more than 100 FHIP awards to eighty-five different organizations.

80.      Consistent with congressional directives, FHIP funding has been used to establish new fair housing organizations in underserved parts of the country, and those organizations continue to exist today because of their continued receipt of FHIP funding.

81.      Plaintiff MFHC is one such example: it was founded with FHIP funding in the early 1990s, structures its operations around FHIP activities and programs, and is reliant on FHIP funding for its continued existence.

82.      For many FHIP recipients, fair housing work is their main work. As the 2011 HUD Study noted, most recipients described fair housing work as their exclusive or primary organizational mission, with just 4% of the study respondents saying that fair housing work was a secondary part of their mission.[9]

83.      And for many organizations, FHIP awards are a major, if not their main, source of funding. In the same vein, FHIP awards typically support most, if not all fair housing

---

[7] 2011 HUD Study at 26.
[8] 2011 HUD Study at 24.
[9] 2011 HUD Study at 28.

organizations' enforcement programs. HUD has recognized that "FHIP grew out of a realization among participants that enforce fair housing laws that a need existed for a large, reliable source of funding for fair housing law enforcement activities—especially for use in testing conducted by private fair housing groups that supported HUD's role of enforcing the Fair Housing Act."[10]

84.     Many FHIP recipients receive FHIP awards in consecutive years and/or concurrent FHIP awards under more than one initiative. The predictability of FHIP funding has enabled organizations to plan programming, maintain their operations, gain firm roots and relationships in their communities, and expand their footprints.

85.     Since FHIP's inception in 1987, PEI grants have been the cornerstone of the program. On average, PEI awards account for 62% of the annual FHIP appropriation. According to the 1997 GAO Report, the high apportionment of FHIP appropriations to PEI grants was reflective of "the program's emphasis on private enforcement-related activities."

86.     On average, EOI awards account for 24% of the annual FHIP appropriation and FHOI awards account for 11% of the FHIP appropriation. Until the FY2025 NOFO, HUD had not made FHIP awards to FHAP agencies since FY1995; since then, FHAP agencies have received a substantial separate annual appropriation, making it unnecessary to divert FHIP funds for that purpose.

87.     HUD itself has noted that many recipients have deemed PEI awards "critical" to organizational stability. HUD quoted one organizational representative as saying that "[m]ost important for stability is whether we get a HUD PEI grant from year to year. . . . We rely on FHIP funding for the majority of our casework."

---

[10] 2011 HUD Study at 10.

88.     For example, MFHC has regularly received PEI funding since its founding, and these awards routinely account for nearly half of the organization's annual budget. Plaintiff NFHA has regularly received PEI funding for over fifteen years.

89.     PEI grants are particularly helpful to organizational stability because they are awarded in three-year increments and thus provide fair housing organizations with a predictable and stable source of funding. This predictability enables organizations to undertake complex and lengthy investigations, support victims of discrimination through administrative and legal processes that often take years to resolve, provide regular and continued support to local officials to help them expand equal housing opportunities, engage in long-term and strategic planning, and make informed decisions about programming, personnel, and physical office space.

90.     Although HUD has at times introduced new components within the three FHIP initiatives enumerated in the law, the program's overall structure and administration have remained largely consistent over time. Many of the changes that HUD has made to the program (such as the introduction of multi-year grants and variations in the size of awards) have been made at the recommendation of fair housing organizations to better facilitate their ability to provide fair housing services and to improve the efficacy of the program.

**The FY2025 and FY2026 FHIP Appropriation**

91.     As part of the FY2025 appropriation process, HUD submitted a CBJ to Congress. The FY2025 CBJ contained HUD's proposal for the $86.4 million in fair housing funds provided by the President's Budget. HUD proposed that $56 million be appropriated to "support grants to private fair housing organizations for enforcement, education and outreach on fair housing rights

and responsibilities."[11] The remainder of the budgeted funding included $26.4 million for state and local enforcement agencies (separately appropriated to be distributed through FHAP), $1 million for the Limited English Proficiency Initiative, and $3 million for the National Fair Housing Training Academy.

92.     The CBJ proposed dividing FHIP funding across the three initiatives in accordance with the historical practice described above, with $42.3 million in PEI grants, $2.7 million in FHOI grants, and $10 million in EOI grants. HUD noted that "FHIP supports critical fair housing enforcement work throughout the United States with PEI, and seeks to expand its coverage to additional areas with underserved communities by building capacity through FHOI. EOI further addresses these goals by supporting awareness and empowerment."

93.     According to HUD, "This Budget makes an investment toward eradicating discrimination based on race, national origin, and other protected characteristics from the housing market." In support of its FHIP request, HUD's FY2025 CBJ also cited data showing ongoing discrimination in the form of inaccessible housing, mortgage discrimination, and rental discrimination against protected class members.

94.     In the Consolidated Appropriations Act of 2025, Congress funded FHIP at the same level as FY2024. *See* Pub. L. No. 119-4, § 1101(a)(12), 139 Stat. 10–12 (2025) (FY2025 Appropriations Act).

95.     The FY2024 appropriation had included $86,355,000 in FHIP funding. This money was for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 et seq.) and section 561 of the

---

[11] 2025 Congressional Justifications, U.S. Dep't of Hous. and Urban Dev. at 33-1, *available at* https://archives.hud.gov/budget/fy25/FY_2025_Congressional_Justification_v3_E-File.pdf.

Housing and Community Development Act of 1987 (42 U.S.C. 3616a)." Pub. L. No. 118-42, 138 Stat. 370 (2024).

96.     The directive in the FY2025 Appropriations Act to fund HUD programs at the same level as in 2024 translated into appropriating the same amount, $86,355,000, for FY2025.

97.     The FY2025 Appropriation Act also provided that such funding "shall be available to the extent and in the manner that would be provided by the pertinent appropriations Act," and "shall retain a comparable period of availability." Pub. L. No. 119-4, 139 Stat. 12 (2025). The FY2025 appropriation will therefore remain available until September 30, 2026. Any funds not obligated by that date would lapse and be unusable for their intended purpose.

98.     In early 2026, HUD posted the requisite Assistance Listings for the $56 million of the appropriation that was earmarked for FHIP (rather than FHAP). Similar to the allocation contemplated by HUD's FY2025 CBJ, the Assistance Listings contemplated $41 million in PEI awards, $4.4 million in FHOI awards, and $10 million in EOI awards.[12] The Assistance Listings also contemplate, in keeping with past practice, modest award sizes to a large number of grantees: $416,127 on average (and $425,000 annual maximum) for PEI recipients, $339,414 on average (and $1,500,000 maximum) for FHOI recipients, and $143,243 on average (and $856,830 maximum) for EOI recipients.

99.     Congress enacted appropriation legislation for FY2026 on February 3, 206. Pub. L. No. 119-173, 140 Stat. 173, 407-08 (2026). The FY2026 Appropriation act specified that

---

[12] Private Enforcement Initiatives, Assistance Listing (last updated Feb. 3, 2026), *available at* https://sam.gov/workspace/assistance/fal/2b1ff4f51a3f4a78aac7bde620b9ba2a/view; Fair Housing Enforcement Initiatives, Assistance Listing (last updated Jan. 19, 2026), *available at* https://sam.gov/workspace/assistance/fal/99eb8ae9d4f242c79b76ee022cecc24a/view; Education and Outreach Initiatives, Assistance Listing (last updated Jan. 20, 2026), *available at* https://sam.gov/workspace/assistance/fal/dc3ce01d1140496a8673754676f26daf/view.

"$56,000,000 shall be for the fair housing initiatives program under such section 561, of which, not less than $10,400,000 shall be available for education and outreach programs, not less than $3,700,000 shall be available for fair housing organization initiatives, and not less than $40,500,000 shall be available for the private enforcement initiative." *Id.* This money is to remain available until September 30, 2027. *Id.*

**The July 2, 2026 NOFOs**

100.    On July 2, 2026, HUD released four NOFOs for the FY2025 and FY2026 appropriations.[13]

101.    First, HUD released a FY2025 FHOI NOFO, which contemplates using $45 million of the FY2025 appropriation to issue five awards ranging from $5 million to $25 million.

102.    Second, HUD released an Administrative Enforcement Initiative (AEI) NOFO for FY2025, which will take $10 million of the money previously earmarked for FY2025 FHIP awards and funnel it to state or local governments and agencies to participate in FHAP. HUD already set aside $26 million of the $86 million in the FY2025 appropriation for FHAP awards, as anticipated in its budget request and expected by Congress. The agency is thus reducing the FHIP appropriation by approximately 18% while increasing the FHAP appropriation by nearly 40%. HUD has not explained this change.

103.    Applications under the FY2025 NOFOs are due August 6, leaving fair housing organizations little over a month to compile materials for a materially altered program (for which they may be unable to reasonably compete in any event). HUD estimates the award date as September 30, 2026—the last day of the FY2025 appropriation—and the start date as February

---

[13] *See* U.S. Dep't of Hous. and Urban Dev., Fair Housing Initiatives Program, https://www.hud.gov/stat/fheo/initiatives-program (linking to NOFOs).

1, 2027. HUD has left itself no time to comply with its statutory obligation to disclose its intended grants to Congress before making them.

104.   Third, HUD also released a FY2026 EOI NOFO with an application deadline of November 2, 2026, an award date of February 28, 2027, and an award start date of July 1, 2027.

105.   Fourth, HUD released a FY2026 PEI NOFO with an application deadline of November 2, 2026, an award date of February 28, 2027, and a project start date of July 1, 2027.

**The FY2025 FHIP Structure Violates the FHA**

106.   HUD typically releases NOFOs in the fall and makes awards in the spring, but the agency did not release NOFOs for FY2025 FHIP funds until July 2, 2026.

107.   One of the two FY2025 NOFOs purports to redirect some of the FY2025 money to state and local FHAP agencies, notwithstanding that those agencies have their own appropriation. The other NOFO for the FY2025 funds (the "FY2025 NOFO") restructures FHIP in a way that will have immediate and long-lasting consequences, most notably: a profound decrease in fair housing enforcement and education.

108.   The FY2025 NOFO contemplates just five large FHOI grants, with no money for PEI or EOI awards, notwithstanding that PEI has always been the core of the FHIP program.

109.   The eligibility restrictions for the FHOI awards likely exclude nearly all existing fair housing organizations, i.e., the very recipients that Congress intended to support in its codification of FHIP. To the extent any existing organizations are somehow eligible, they are disfavored by the review criteria. The NOFO also mandates compliance with a host of grant conditions that are irrelevant to or incompatible with fair housing work.

110.   This means that over 100 fair housing organizations that rely heavily on FHIP funding will not receive any FY2025 funds. This deprivation will force the organizations to cut back on staff, cut back on services, stop assisting residents in their communities with housing

28

needs, and potentially close. The FY2025 NOFO will thus decrease fair housing enforcement and education when it is statutorily required to do the opposite. Put simply, it accomplishes the same result from the perspective of FHIP grantees as HUD's previous outright refusal to issue FY2024 NOFOs—the only difference being that HUD, rather than not spending the money at all, is redirecting it to purposes that do not further the FHIP objective of building, maintaining, and strengthening a network of local nonprofit fair housing organizations.

111.    The FY2026 NOFOs contemplate PEI and EOI grants, but they do not solve the problems created by the FY2025 NOFOs. To begin, the FY2026 award won't start for another year, and many fair housing organizations cannot wait that long for FHIP funds. The FY2026 NOFOs also exclude certain existing fair housing organizations. For those who can apply, these NOFOs contain the same review criteria and award conditions as in the FY2025 awards.

A.    **Overhaul of FHIP Structure and Exclusionary Eligibility Criteria**

112.    HUD has historically used the annual FHIP appropriation to award grants to dozens (or more) out of more than 150 different fair housing organizations. In doing so, it has facilitated fair housing enforcement and education by a broad array of organizations serving a diverse range of communities.

113.    The award structure set forth in the FY2025 NOFOs is a dramatic departure from HUD's past practice, from the proposed allocation in the CBJ, and from the still-posted Assistance Listings.

114.    For the first time in FHIP history, there will be no new PEI or EOI grants. Instead, HUD is directing $45 million of the FY2025 FHIP appropriation toward FHOI grants, and $10 million toward entities that are separately accounted for by FHAP funding.

115.    Plaintiffs are aware of at least nineteen PEI grants that have already ended this year or will be ending before September 30, including MFHC's PEI award. The organizations

29

receiving these grants, many of which have been PEI grantees for many years, had a reasonable expectation of at least being able to compete for new PEI awards, yet the NOFO leaves PEI funding entirely out for the first time in the program's history, leaving them nothing for which they can apply.

116.    HUD is not using any of the FY2025 appropriation for ongoing PEI grants, even though the agency usually sets aside funds for that purpose. HUD has instead deferred funding of these multi-year awards to the FY2026 appropriation, which does not need to be obligated until September 30, 2027. As a result, fair housing organizations waiting to start their second and third years of their ongoing PEI grants risk funding gaps of more than a year. For example, the second year of NFHA's PEI grant ends shortly, yet HUD has taken no action to begin the next grant year.

117.    Additionally, since HUD has significantly decreased its FHEO staff, it has taken HUD a much longer time to negotiate FHIP grant awards once they are made. For example, as of July 17 of this year, HUD still had not finalized all of the awards it issued on September 30, 2025. If protracted negotiations persist for future funding cycles, awardees may experience a lapse in funding for eighteen months or longer.

118.    HUD is also decreasing the number of awards, exponentially increasing the size of the awards, putting all FY2025 FHIP money toward FHOI awards, and excluding current PEI awardees. When combined, these changes mean that the entire FY2025 FHIP appropriation will be open to (and indeed will favor) organizations with no fair housing experience, whereas the fair housing organizations and qualified fair housing organizations that are listed in the text of the FHA are all likely ineligible for FY2025 funds.

119.    In FY2024, HUD issued more than 100 FHIP awards. For FY2025, HUD intends to make just five FHIP awards to organizational recipients, all of which will be FHOI awards.

For the first time in FHIP's existence, there are no new PEI awards and no EOI awards, nor will the agency be funding ongoing PEI awards from the FY2025 appropriation.

120. The dollar values of these awards are astronomical. Before this year, FHOI awards never *totaled* more than $10 million out of any single appropriation. As the FY2025 FHOI NOFO notes, the FY2024 FHOI awards were up to $260,000 each. Now, the largest award is $25 million, more than double the previous *aggregate* ceiling, while the remainder are all ten times larger than last year's FHOI awards.

121. FHOI awards are the only category of FHIP awards that are available to organizations other than those defined in the FHA and its implementing regulations (fair housing organizations and qualified fair housing organizations). The FHA permits FHOI awards to "nonprofit groups organizing to build their capacity to provide fair housing enforcement." 42 U.S.C. § 3616a(c)(1). The NOFO further notes as potential recipients "other public or private nonprofit entities that are formulating or carrying out programs to prevent or eliminate discriminatory housing practices."

122. The handful of grants that will be made from the FY2025 FHIP appropriation are thus available to organizations that do not currently do fair housing work and have not done it in the past.

123. FHOI awards are also the only category of FHIP awards with a budget-related criterion enumerated in the FHA, which the NOFO reiterates: FHOI awards may not provide more than 50% of the operating budget of the recipient organization for any one year. Recipients will have to submit a certification that the FHIP award complies with the budgetary cap.

124.    Because the smallest award available is over $5 million across two years,[14] or $2.5 million a year, the 50% budget cap means that a recipient must have an anticipated operating budget of at least $5 million. Most existing fair housing organizations have an operating budget of just $400,000 to $2 million, meaning that the NOFO makes most fair housing organizations categorically ineligible for FY2025 FHIP funding.

125.    By shifting all nonprofit FHIP awards to the FHOI category while eliminating PEI and EOI awards, HUD has needlessly imposed this limitation across the FY2025 FHIP appropriation. Together, the structure of the contemplated awards and the imposition of the budget cap across the appropriation will exclude all or nearly all existing fair housing organizations.

126.    The NOFO additionally prohibits recipients from having multiple different types of FHIP awards at the same time. Any organization with an ongoing multi-year PEI grant cannot apply for an overlapping FY2025 award without discontinuing the existing award. Given that PEI funding is the core funding stream for so many organizations and because PEI grants bring stability over multiple years, discontinuing a PEI award is not feasible for most recipients. Giving up PEI funds would also significantly impair the ability of fair housing groups to assist the people they are currently aiding, which undermines the FHA and Congress's goals in codifying FHIP.

---

[14] Although the minimum award amount for the smallest awards is $2 million over two years, the FHOI NOFO states that HUD expects to make only one award for each subcomponent, each of which is $5 million. HUD also cannot award less than the total amount of FY2025 funds appropriated to FHIP. Accordingly, under the NOFO and applicable law, the smallest award will be $5 million. Even if the smallest award was $2 million, most existing fair housing organizations would still be excluded by the 50% budget cap.

127.   Plaintiffs are aware of at least fifty-seven PEI grants that will be ongoing as of February 1, 2027, rendering those applicants ineligible for FHOI awards. For FY2024, twelve of the fourteen FHOI recipients also had ongoing PEI grants or received new ones at the same time.

128.   HUD has not explained why it is proceeding with a FHIP allocation that would bar nearly all the organizations specifically identified in the FHA and its implementing regulations—the very organizations that the FHIP program is meant to largely operate through—from participation in the program.

129.   HUD also does not acknowledge, let alone justify, an allocation that will necessarily decrease fair housing enforcement and education by excluding nearly all fair housing organizations and qualified fair housing organizations.

130.   Without FY2025 FHIP funding, these organizations will have to wind down existing FHIP-funded activities, and many will face complete closure. The FY2025 funding allocation thus undermines nationwide fair housing enforcement and education in the near and long term and contradicts the FHA itself.

131.   Harming fair housing organizations and their work is directly contrary to the primary purpose of FHOI grants, where HUD has directed all the money, which is to "establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved." 42 U.S.C. § 3616a(c)(2). Rather than adding new or stronger fair housing enforcement organizations, the NOFO takes a sledgehammer to the network that currently exists. Put differently, FHOI awards are meant to *add* capacity to the fair housing network, and a NOFO that *subtracts* capacity by pulling money away from most, if not all, existing grantees can't possibly accomplish that purpose.

132.    Lest there be any doubt about the intent to direct funds away from the FHIP program's historic and intended primary grantees, the FHOI NOFO outright says it is geared toward entities other than fair housing organizations, emphasizing law schools and litigation groups as strong candidates for funding. For example, for the FHOI-G and FHOI-SPA awards, "HUD strongly encourages Universities with ABA approved law schools to apply, and will award preference points to qualified applicants that are Universities with ABA approved law schools." For the FHOI-NISP award, HUD highlights "universities, public interest law firms, religious liberty groups, trade associations" as potential candidates. For the FHOI-NSLP award, HUD mentions "public interest law firms [and] religious liberty groups" as potential candidates.

133.    The FHOI NOFO does not explain HUD's substantial departure from past practice, from the FY2025 CBJ, and from the FY2025 Assistance Listings. The NOFO also does not explain the decision not to fund PEI or EOI awards.

134.    The little insight that HUD does provide for this major restructuring is either incorrect or unsupported. The FHOI NOFO refers to a "backlog" of fair housing complaints, but those are complaints that are pending with the agency's FHEO, not a backlog of complaints with fair housing organizations. To the extent that HUD's concern is that experienced fair housing organizations are likelier to file complaints, that is how the program is meant to operate. And as noted above, one of the functions that local fair housing organizations have long performed is to resolve complaints informally without the need for an administrative complaint to be filed. HUD's asserted concern with the backlog also rings hollow given the agency's recent staffing cuts to FHEO, which exacerbate the problem by limiting the number of employees available to work on complaints.

34

135. The FHOI NOFO also claims to be broadening the universe of FHIP recipients, yet that has always been part of the program: HUD regularly expands the universe of FHIP recipients through reasonably sized FHOI awards to new nonprofits, and it does so without reducing other enforcement and education work and without excluding existing recipients. This NOFO, instead, radically narrows and reduces the universe of FHIP recipients to just a handful.

136. The FHOI NOFO also asserts that "[i]mplementation of activities that were unsupported by original FHIP program goals resulted in FHEO not fully meeting its intended goals, leading to waste of taxpayer dollars, and too often the production of low-quality, redundant deliverables. The NOFO does not identify a single instance of "waste" or "low-quality, redundant deliverables." Nor does the NOFO identify instances where original FHIP programming resulted in FHEO "not fully meeting its intended goals" (let alone identify the intended goals). By contrast, HUD's performance evaluations have been high enough for most existing fair housing organizations such that they are able to reapply for FHIP funding in subsequent cycles.

### B.    Review Criteria and Risk Review

137. Additional aspects of the FHOI NOFO show a disregard for the FHA's text and purpose. The NOFO's eligibility requirements state that awardees also may not use FHIP funds to "subsidize or facilitate racial preferences or other forms of illegal discrimination, including activities where race or intentional proxies for race will be used as a selection criterion for employment or program participation."

138. The NOFO does not define what constitutes "illegal discrimination," but, as addressed below, the FHOI NOFO incorporates executive orders that deem diversity, equity, and inclusion programs to be unlawful discrimination. This position is at odds with existing federal and state antidiscrimination laws, including the FHA itself. It is also at odds with HUD's prior

directives, including previous FHIP focuses on racial equity and the current focus on equity in HUD's operative strategic plan, the Fiscal Year 2022-2026 Strategic Plan. It is therefore entirely possible that HUD will deem existing fair housing organizations' work to be unlawful, even if the agency itself previously funded or encouraged it and even if such work is not actually illegal.

139.    The substance of the work permitted under the two largest FHOI awards is also categorically different from FHIP's statutory focus on fair housing enforcement work. Instead, the NOFO proposes using more than $35 million of the appropriation for a host of other activities, including work to support *housing providers* instead of *housing consumers*.

140.    For example, the NOFO suggests the following "projects that would support the goals and objectives" of the $25 million FHOI-G award:

- Development of law school curriculum focused on fair housing rights and remedies, including constitutional and statutory limitations of enforcement
- Expanding support networks for property owners (not simply buyers or renters), including for small landlords, that may not have access to legal counsel
- Educating complainants and respondents on their rights and responsibilities
- Provide assistance to the general public through legal clinics to promote awareness, enable enforcement, provide legal counsel, complaint intake, and legal assistance
- Developing opportunities for law students to gain practical experience in fair housing law, for instance through clinical education and internships (these may also focus on arbitration/mediation of meritorious claims)
- Coordinating/facilitating regional and national convenings focused on fair housing related topics
- Conduct training and other educational programming related to fair housing
- Authoring and publishing fair housing related materials

141.    The NOFO also identifies two "special focus areas" for the FHOI-G award: State and Local Housing Discrimination and Religious Liberty Protection. Neither topic was cited in HUD's CBJ or the underlying studies and analyses on which HUD relied. Nor is either focus area identified in HUD's Fiscal Year 2022-2026 Strategic Plan.

142.    An internal email from Assistant Secretary Craig Trainor to FHEO staff on July 3, the day after the NOFO's publication, touted the agency's recent investigations into housing programs promoting racial equity in Boston and Minneapolis, indicating that the first focus area will be to support challenges to state and local programs promoting equitable access to housing.

143.    NFHA's annual Fair Housing Trends Reports provide sound understanding for why "state and local housing discrimination" and "religious liberty protection" would not have been included in HUD's CBJ. Last year, discrimination based on religion only made up 1% of all fair housing complaints. This has been the pattern since NFHA began collecting and reporting on data regarding fair housing complaints.

144.    The $10 million FHOI-SPA award is also not for building enforcement capacity or for enforcement itself, but instead for "establishing or supporting national, regional, local, and community-based education and outreach activities, events, and programs."

145.    Other aspects of the FY2025 NOFO are also new and unexplained. The merits review section identifies four different scoring factors, each of which has a different amount of points assigned, for a total of 100 points.

146.    Within Rating Factor 2, applicants must include certain required narratives, worth ten points each, 10% of an applicant's total score. Required Narrative Element 2 concerns Executive Order (EO) 14332, titled "Improving Oversight of Federal Grantmaking." As the NOFO explains, this EO "prohibits the use of funds to promote or subsidize immigration, illegal racial preferences or discrimination, or initiatives that promote gender ideology." This requirement also: states that "funds used under this NOFO cannot be used for any type of illegal racial preferences" (without defining "illegal racial preferences or discrimination" or "gender

37

ideology") and emphasizes "restoring equal access and the protection of faith-based activities for faith-based organizations that operate consistent with their sincerely held religious beliefs."

147.   Applicants are required to use the narrative to explain how the award, if funded, would support the advancement of the foregoing priorities.

148.   Because the administration has indicated that it considers diversity, equity, and inclusion programs to amount to unlawful discrimination, Required Narrative Element 2 requires applicants to disavow all such efforts, even if they are required under federal, state, or local law. Such a disavowal is in direct tension with the FHA itself which, as just one example, requires reasonable accommodations to ensure equal opportunities for people with disabilities.

149.   Required Narrative Element 2 likewise requires applicants to reject transgender individuals' gender identity or prohibits treating them in accordance with that identity, even if federal, state, or local law requires otherwise. Such a rejection is in direct tension with the FHA itself, which HUD has previously construed to require the opposite—acknowledgement of gender identity and treatment in accordance therewith.

150.   Required Narrative Element 2 is also in direct tension with HUD's previous directive that FHIP funding be used to increase racial equity and to address discrimination on the basis of sexual orientation and gender identity. They are also in tension with the directives in HUD's Fiscal Year 2022-2026 Strategic Plan, which specifically incorporates previous executive orders that call for increasing diversity, equity, and inclusion and eliminating discrimination on the basis of sexual orientation and gender identity.

151.   Required Narrative Element 4 presents similar issues. It requires applicants to identify a secretary-initiated investigation opened by HUD in the last seven months that is "closest to [their] proposed project area and discuss whether the investigation aligns with your

range of investigative and enforcement activities." The secretary-initiated investigations opened during that timeframe target public agencies, cities, and a state lending program for racial equity projects. Although such projects are consistent with the FHA and other applicable law and were previously encouraged by HUD itself, applicants must disavow them and explain how they might work against such inclusionary efforts.

152.    In addition to the Rating Factors, the NOFO contemplates certain preference points. For each of the five potential awards, up to four preference points are available to certain applicants, including: ABA approved law schools that operate legal aid clinics providing legal support to the general public; universities with both an ABA approved Law School and an Architecture School; first-time applicants for FHIP funding; and public interest law firms and universities with legal aid clinics. Fair housing organizations are not eligible for these preference points and thus are severely disadvantaged in the application scoring process. FHIP is a highly competitive program and, typically, even applicants with near-perfect scores do not receive FHOI awards. Providing preference points for first-time applicants will thus knock out previous FHIP grant recipients.

153.    The NOFO also calls for a "risk review," which entails several amorphous and subjective criteria, and which can carry a score reduction of five points for applicants deemed high risk.

154.    For example, the risk review will include "[t]he scope of the overall projected impact on the program and administrative goals and priorities in this NOFO," and permits HUD to rely on materials outside the application or past FHIP performance, such as "news reports."

155.    The risk review also permits HUD to "consider any history of illegal discrimination, including illegal racial discrimination as well as any unresolved civil rights

39

charges or complaints that arise after the application period." Based on the executive orders and the secretary-initiated investigations referenced in the NOFOs, it is entirely possible that HUD will consider an applicant's previous racial equity work—which may well have been funded through FHIP—to be illegal discrimination and reduce their score accordingly (if not bar them from the program entirely).

156. HUD has extended the retrospective review of applicants to the past five years, which means that applicants' "risk" may be evaluated by comparing years' old conduct—including conduct that was previously encouraged or even required by HUD—against brand new administrative goals and priorities.

157. The inclusion of uncertain risk review criteria presents an opportunity for HUD to impose its unrelated priorities under the guise of a legitimate review. Without standards or metrics to function as guardrails to these criteria, HUD will have no trouble wielding its discretion to unfavorably evaluate and further disadvantage fair housing organizations.

**C.      Award Conditions**

158. The FY2025 NOFO requires successful grantees to comply with award conditions that are the same or similar to conditions that courts have repeatedly struck down in other contexts, including other HUD grants.

159. Many of these conditions are vague, irrelevant to fair housing work, and/or at odds with applicable laws. The requirement to comply with these conditions appears to apply to all of the recipients' work, not merely the recipients' work under the FHIP award.

160. For example, the FY2025 NOFO requires compliance with EO 14173 (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) and EO 14151 (Ending Radical and Wasteful Government DEI Programs and Preferencing). Recipients would not be able to

40

develop outreach programs that are designed to increase equal access to housing, even though that work would clearly accomplish the goals of FHIP and the FHA more generally.

161.    Awardees must also comply with EO 14218 (Ending Taxpayer Subsidization of Open Borders), which mandates verifying immigration status and seeks to ensure "that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called 'sanctuary' policies that seek to shield illegal aliens from deportation," 90 Fed. Reg. 10,581 (Feb. 19, 2025). It is possible that compliance with this executive order would require recipients to engage in the very national origin discrimination that is prohibited by the FHA.

162.    The FY2025 NOFO requires awardees to comply with EO 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government), which rejects as "false" the notion that "males can identify as and thus become women and vice versa" and purports to require agencies to "ensure grant funds do not promote" this so-called "gender ideology." But this executive order is in tension with myriad laws. At the federal level, the FHA and Title VII prohibit discrimination in housing and employment, respectively, on the basis of sex, which includes gender identity. 42 U.S.C. §§ 3604(a)-(b), 2000e–2(a)(1); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) (interpreting Title VII to prohibit discrimination based on gender identity); *see Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmty. Project, Inc.*, 576 U.S. 519 (2015) (likening FHA's sex discrimination provisions to those of Title VII). Recipients may face legal exposure by applying these executive orders to all their operations, such as hiring and promotion decisions.

163.    In addition to changes in the award conditions, the structure of the awards is different this year. In the past, HUD has primarily used grants to deploy FHIP funding. The

FY2025 NOFO structures the FHOI awards as "cooperative agreements," not grants. The NOFO provides that, "[u]nder a cooperative agreement, HUD will exercise the right to approve, and have substantial involvement in, all proposed deliverables, as well as the Work Plan or Statement of Work."

**The FY2026 NOFOs Will Also Diminish Fair Housing Enforcement and Education**

164.    An organization that does not qualify for one of the FY2025 FHIP awards will have to wait an additional five months to know whether they have received any other FHIP funding and, if so, nearly a year to start their awards. Thus, even if they had any prospect of getting an FY2026 PEI or EOI grant, the many fair housing organizations whose PEI awards have already ended or are soon to end would experience an unjustified year-long gap in their federal funding. In any event, other features of these NOFOs make it virtually impossible, if not fully impossible, for current FHIP grantees to receive awards.

165.    The FY2026 EOI and PEI NOFOs contain many of the same defects as the FY2025 FHOI NOFO. For the first time, the EOI and PEI NOFOs include the operating budget cap, and thus exclude any organization that would derive more than 50% of its operating budget from the FHIP award. The FHA does not contain a budget cap for PEI and EOI recipients, showing Congress did not mean for those awards to be restricted in this manner.

166.    The FY2026 PEI and EOI NOFOs also provide new applicants with four preference points during the application review phase, even though Congress specifically prescribed that PEI grants are for "private nonprofit fair housing organizations," 42 U.S.C. § 3616a(b)(1), and even though these points will disfavor current FHIP recipients without explanation or justification.

42

167.    The FY2026 PEI NOFO also excludes recipients of FY2023 and FY2024 PEI awards, even though most FY2023 PEI awards will conclude before the estimated July 1, 2027 start date for the FY2026 PEI awards. Such organizations will have to wait until the FY2027 FHIP cycle to see if they qualify for future PEI awards, and may have to wait until summer 2028 to begin their next PEI award. So just as HUD is eliminating any chance of continuing funding for FHIP grantees whose PEI grants expire this year (by eliminating PEI altogether and otherwise making them ineligible for FY2025 awards, as described above), it is thus eliminating another set of organizations' primary source of funding for a year, leading to possible closure and certain reduction of fair housing work.

168.    In the unlikely event that any existing fair housing organization does receive a FY2025 FHOI award, the award will render it ineligible for FY2026 PEI and EOI awards. In previous FHIP application cycles, organizations were eligible to receive more than one FHIP award at the same time, e.g., an organization could receive both a multi-year PEI award and a twelve-month EOI award. That was consistent with the understanding, until now, that PEI grants are the bread-and-butter FHIP grant—the one that allows local nonprofit organizations to enforce the FHA—and the other grants are meant to supplement, not replace, PEI grants. But the FY2025 NOFO states that "HUD generally intends to make no more than one new FHIP award to the same organization during the FY2025/FY2026 funding cycle."

169.    The EOI and PEI NOFOs also contain the same subjective risk review criteria and require grantees to comply with the same suite of conditions.

170.    HUD usually uses a portion of the annual FHIP appropriation to fund the second and third years of existing PEI awards. It is not doing so for FY2025; those ongoing grants will

instead be funded from FY2026 funds, which do not carry the same September 30 obligation deadline.

171.    As of this filing, HUD has not started negotiating the second- and third-year agreements with these grant recipients. More than twenty qualified fair housing organizations who rely on their multi-year awards are already experiencing funding gaps because of this delay.

172.    Despite inquiries from counsel, HUD has refused to clarify whether it anticipates completing the second- and third-year grant negotiations by September 30 of this year. Nor has HUD explained why it still is not beginning these negotiations. It is possible that HUD will string along the negotiations with current PEI awardees while barring them from FY2025 awards and from FY2026 PEI awards. The necessary result of this conduct is less fair housing enforcement immediately and irreparable, long-term devastation of the local fair housing network.

173.    HUD's efforts to eviscerate FHIP and its longtime grantees through grant terminations, delays, and the new NOFOs are part and parcel of the agency's broader efforts to dismantle fair housing enforcement more generally.

174.    HUD has attempted to dismantle fair housing work in other ways, too. Reports indicate that FHEO has lost two-thirds of its staff since January 2025, including a 100-person reduction in force by HUD that was disclosed in October 2025.

175.    A whistleblower report disclosed that HUD has violated its statutory duty to charge and prosecute complaints where reasonable cause exists to believe discrimination has occurred, withdrawing three charges of discrimination and four letters finding noncompliance with civil rights laws.

176. The whistleblowers also reported that HUD has unilaterally changed terms or cancelled fully executed agreements to resolve administrative complaints of discrimination.

177. The day after issuing the FY2025 and FY2026 NOFOs, the Assistant Secretary for FHEO, the HUD office that oversees FHIP, sent an email to employees touting "organizational transformation" and specifically citing the just-released FHIP NOFOs. Two weeks later, the agency withdrew over a dozen guidance memoranda—including one that has been in place since 1990—designed to increase access to housing and protect consumers from discrimination.

178. HUD also recently published a Unified Agenda entry foreshadowing the publication of an Interim Final Rule that will "update the qualification requirements for Fair Housing organization applicants under the FHIP program, define the scope of testing conducted under the private enforcement initiative, update the NOFO guidelines, and ensure adequate performance standards and ongoing assessments for grantees." This entry effectively concedes that the FY2025 NOFO is inconsistent with existing FHIP regulations.

**INJURY TO PLAINTIFFS**

179. Plaintiff NFHA is a 501(c)(3) nonprofit membership organization that advocates for equal housing opportunity. NFHA leads a coalition that works to build inclusive, well-resourced, and resilient communities; expand equitable opportunities; and end housing discrimination.

180. Plaintiff NFHA represents its members and their interests, including approximately 163 private, nonprofit member organizations throughout the country, many of whom are eligible for FHIP funding and would apply for FY2025 and FY2026 FHIP funding under typical NOFOs but are ineligible for funds for the reasons stated above.

181.    For FY2025, NFHA would ordinarily apply for both EOI and FHOI grants. NFHA is also a current PEI recipient, and NFHA would ordinarily receive monies from the FY2025 FHIP appropriation for the third and final year of its ongoing grant. The second year of NFHA's ongoing PEI grant will end on July 31, 2026. To date, HUD has not started negotiating the third year of this grant. Because HUD has disclosed that it will be funding ongoing PEI awards from the FY2026 appropriation, the funds for NFHA's third year may not be obligated until September 30, 2027, leaving NFHA with a midstream PEI funding gap of more than a year.

182.    NFHA has long relied on FHIP grants to achieve its fair housing mission and purpose and directly advances the goals of the FHA and of the FHIP program. In just the last five years, NFHA has received approximately $8 million in FHIP grants, which all have been used in important ways to advance equal opportunity in housing; build fair housing capacity in communities around the country; eliminate acts of discrimination; educate the public, government, and housing providers on their rights and obligations under the law; and provide compensation to victims of discrimination.

183.    For example, with FHIP funding, NFHA has throughout various regions of the country:

- Conducted fair housing intakes, testing and investigations, and advocacy.
- Provided education and outreach to develop consumer and stakeholder awareness in metropolitan areas that lack private fair housing centers.
- Implemented national fair housing media campaigns.
- Recruited and trained local fair housing testers to investigate possible housing discrimination.
- Engaged in multi-jurisdictional investigations and advocacy with local fair housing centers.
- Operated a national fair housing intake program that receives housing discrimination complaints and provides advocacy services, technical assistance, and referrals.

- Assisted in the creation of full-service private fair housing centers.

184. With past EOI grants, NFHA has created and run national media campaigns designed to provide information to all people in the United States about their fair housing rights. The campaigns particularly target underserved populations to address currently pervasive or increasing types of discrimination or gaps in the type of educational materials available.

185. NFHA has managed more national fair housing public service campaigns than any organization in the country. These campaigns have included comprehensive and varied digital and social media; web-based search marketing; television, radio, print, and online public service announcements in many languages; development of landing pages and websites; a podcast; distribution to media and community-based outlets throughout the United States; videos about fair housing/fair lending rights for the Deaf and hard of hearing, the HUD complaint process, and the power of the Fair Housing Act, all in collaboration with HUD, civil rights agencies, and other organizations.

186. NFHA's FHIP-funded media campaigns over the past fifteen years have averaged more than 370 million audience impressions per year and more than $12 million in donated media per year. That is, NFHA has efficiently and effectively leveraged the money the federal government provides to educate a broad audience.

187. NFHA has observed that media campaigns are critical to informing consumers about their fair housing rights and housing providers about their fair housing responsibilities. NFHA has developed, over the years, a wide network of over 3,000 organizations with whom NFHA shares its fair housing educational materials. Without this information, the goals of the Fair Housing Act are undermined, and housing discrimination continues, harming individuals, families, and communities. NFHA's inability to produce and distribute these campaigns impairs

its mission to build inclusive, well-resourced, and resilient communities; expand equitable opportunities; and end housing discrimination.

188.    With FHOI-Establishing New Organizations Component (FHOI-ENOC) grant funding, NFHA has successfully established more fair housing organizations than any other agency in the U.S. NFHA has been the sponsoring organization for new fair housing organizations in Memphis, Denver, Montgomery, Fresno, San Antonio, Houston, New Orleans, Indianapolis, and Dallas.

189.    Currently, NFHA is using FHOI-ENOC funding to help develop a new fair housing organization in North Carolina. That organization, like most in the NFHA network, has a mission of ensuring that all residents of the community have meaningful access to safe, affordable, and accessible housing of their choice; expanding an inclusive and equitable housing market; fostering stable communities; and preventing and eliminating unlawful housing discrimination. Without continued assistance from NFHA through its FHOI-ENOC grant, the nascent North Carolina group will lack necessary funding, be undertrained, have insufficient experience to qualify for its own funding, and will likely close.

190.    NFHA has multiple employees whose salaries are paid for in whole or in part by FHIP funding. These employees work at all levels within the organization, including in enforcement; education and outreach; member services; creating, developing, and strengthening fair housing enforcement organizations; and finance. Without continued FHIP funding, NFHA will have to reduce the number of staff working in many of these areas. Because of the limitations that the FY2025 NOFO has placed on NFHA's ability to apply for and receive FY2025 FHIP funding, NFHA anticipates that it will have to consider layoffs in the near future if other funds are not secured to continue this work.

191.    As a nonprofit fair housing organization that has relied on FHIP grants for decades, NFHA understands the importance and necessity of continued FHIP funding to allow its members to continue to operate and pursue their missions of ensuring equal housing opportunity for all throughout the country. Just as NFHA is harmed by the dismantling of the FHIP program, so are its members who also need FHIP funding to continue to pursue their fair housing-related missions. NFHA is therefore well-suited to represent its members who would apply for FY2025 and FY2026 funding but for the radical change in the FY2025 and FY2026 NOFOs.

192.    Most of NFHA's fair housing organization members rely on FHIP funds to conduct activities to advance fair housing and fair lending for all and to enforce fair housing and fair lending laws, including engaging in fair housing policy and advocacy, enforcement, education and outreach, and housing counseling; communicating and working with local community leaders on fair housing and lending rights; and conducting training about fair housing and lending rights and responsibilities, the harmful effects of segregation and other discriminatory practices, and the need to counteract the effects of these harmful practices.

193.    Most of NFHA's organizational members rely on FHIP funding to conduct their day-to-day fair housing operations, and many could not survive in the absence of FHIP funding. If the FY2025 and FY2026 funds are not available, many NFHA members will experience serious funding gaps with profound implications for their operations. NFHA members will be forced to stop work, turn away clients, cancel leases, and lay off staff members. Such funding gaps will also worsen the existing budgeting chaos and confusion that have been caused by HUD's recent failure to administer FHIP awards.

194.    MFHC was founded in 1989 by legal services attorneys and shelter advocates with monies from the first round of grants offered through the then-newly created FHIP program.

The organization aims to eliminate housing discrimination and promote equal access to housing through community legal education and outreach, housing mobility counseling, civil rights investigations, individual legal representation, impact litigation, and public policy advocacy.

195.    MFHC has eight full-time staff and an annual budget of approximately $800,000. It is in its final year of a three-year PEI grant that totaled $1,275,000. Funding under the PEI grant will expire at the end of August. Nearly half of MFHC's annual budget has been supported by the PEI grant—MFHC has otherwise received state and other small grants to support its fair housing work. MFHC anticipated applying for new PEI and EOI grants to continue its nearly forty-year history of FHIP funding when the FY2025 NOFOs were published. The FY2025 NOFOs provide for no PEI or EOI grants for which MFHC could apply.

196.    Through its current PEI grant, MFHC had provided a full range of services, including reviewing intakes and investigating complaints; providing advice and representation (including referring meritorious fair housing complaints for enforcement with an administrative agency or in court); building and maintaining its robust testing program and conducting complaint-based, audit, and systemic testing investigations; providing housing placement and counseling; and providing broad outreach and education services to individuals and families as well as to housing providers and professionals.

197.    MFHC is also a subcontractor on an EOI grant, through which it received $41,000 this year. Through the EOI grant, MFHC engaged in outreach, education, and training in both urban and rural areas of Hampden, Hampshire, Berkshire, and Franklin Counties regarding housing discrimination to organizations and individuals, including training to healthcare providers and education for first-time homebuyers. The FY2025 NOFOs do not provide for any EOI grants.

50

198.    MFHC has provided critical fair housing services with the HUD funding it has received. MFHC's performance and sound financial management have been rated "very good" or "excellent" by HUD on all grants closed since 2001.

199.    Without continued FHIP funding, MFHC will be forced to stop providing critical programming that furthers the purpose and intent of the FHA, including services that have assisted people suffering harm from various forms of housing discrimination. MFHC represents about fifty clients at any given time and accepts about five new housing discrimination cases per week. Without FHIP funding the organization will be forced to stop accepting any new clients for legal cases and housing search assistance.

200.    Cutting the advocacy, testing, and education and outreach services MFHC can provide will have a significant impact on the residents of the communities MFHC serves. MFHC is the only provider of housing search assistance for individuals and families with housing vouchers. MFHC also has a unique focus within its service area in focusing on lead paint advocacy. Because Massachusetts requires remediation of lead paint in rental units only for families with young children, landlords often avoid renting to these families, in violation of the FHA's bar on familial status discrimination. MFHC has secured lead remediation in many housing units, creating new housing for families, but will be unable to continue to pursue this work without FHIP funding. The organization will also be unable to continue its important efforts to secure stable housing for women experiencing domestic violence. The reduction of MFHC services that will be required without continued FHIP grants will frustrate the FHA's purpose of preventing housing loss on the basis of protected characteristics and have a significant and harmful impact on the communities the organization serves.

201.    MFHC will have to lay off about half its staff if PEI and EOI grants continue to be unavailable in the FY2025 funding cycle. MFHC is unlikely to qualify for FY2026 FHIP grants given the restrictive criteria set forth in the NOFO. With FHIP grants unavailable to the organization for two funding cycles, the organization—which has been ably serving the fair housing needs of the communities in its area since Congress created the FHIP program—will likely close.

## CAUSES OF ACTION

### Count I
### Administrative Procedures Act, 5 U.S.C. § 706(2)(A)
### Arbitrary, Capricious, and Abuse of Discretion

202.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

203.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion" 5 U.S.C. § 706(2)(A).

204.    An agency action is reviewable under the APA if it is a final agency action. *Id.* § 704.

205.    The issuance of the FY2025 and FY2026 NOFOs is a final agency action subject to review under the APA.

206.    HUD has provided no reasonable explanation for its restructuring of FHIP funding, or for the eligibility criteria, scoring criteria, and grant conditions set forth in the NOFOs. To the extent the agency provides any reasoning at all, the reasoning does not reasonably explain the changes made and is pretextual.

207.    HUD has provided no reasonable explanation for the zeroing out of funding for PEI and EOI grants in FY2025.

208.   HUD has provided no reasonable explanation for proceeding with a FHIP funding scheme that will bar most, if not all, existing fair housing organizations.

209.   HUD has provided no reasonable explanation for the necessary decrease in fair housing enforcement and education, as well as the long-term capacity for such services around the country, that will necessarily result from its restructuring of FHIP.

210.   HUD has provided no reasonable explanation for the imposition of its award conditions.

211.   HUD has not provided a satisfactory explanation for the facts found and the choice made.

212.   HUD failed to consider important aspects of the problem when adopting the FY2025 and FY2026 NOFOs.

213.   HUD failed to account for reliance interests, including those of Plaintiffs, other fair housing organizations, and the communities they serve.

214.   The FY2025 and FY2026 NOFOs must be declared unlawful and set aside as "arbitrary, capricious, [and] an abuse of discretion" 5 U.S.C. § 706(2)(A).

**Count II**
**Administrative Procedures Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law**

215.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

216.   The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A).

217.   An agency action is reviewable under the APA if it is a final agency action. *Id.* § 704.

218.   The issuance of the FY2025 and FY2026 NOFOs is a final agency action subject to review under the APA.

219.    The FY2025 and FY2026 NOFOs will decrease fair housing enforcement and education by depriving fair housing organizations of funding for their work in both the near and long term, even though Congress established FHIP to support these exact entities. A FHIP funding structure that fails to provide nonprofit fair housing organizations with any funds for fair housing enforcement and education runs counter to the text and purpose of the FHA, which contemplates funding fair housing organizations to increase FHA enforcement across the country.

220.    The grant conditions contradict the FHA itself as well as other federal, state, and local antidiscrimination laws.

221.    The FY2025 and FY2026 NOFOs must be declared unlawful and set aside as "not in accordance with law." 5 U.S.C. § 706(2)(A).

**Count III**
**Administrative Procedures Act, 5 U.S.C. § 706(2)(C)**
**In Excess of Statutory Authority**

222.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

223.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" 5 U.S.C. § 706(2)(C).

224.    An agency action is reviewable under the APA if it is a final agency action. *Id.* § 704.

225.    The issuance of the FY2025 and FY2026 NOFOs is a final agency action subject to review under the APA.

226.    The FY2025 and FY2026 NOFOs will decrease fair housing enforcement and education by depriving fair housing organizations of funding for their work in both the near and long term. A FHIP funding structure that reduces fair housing enforcement and education, and

undermines the capacity of fair housing organizations to provide such services, runs counter to the text and purpose of the FHA, which contemplates funding fair housing organizations to increase FHA enforcement across the country.

227.    HUD does not have authority to administer FHIP in a manner that decreases fair housing enforcement and education.

228.    HUD does not have authority to impose grant conditions unrelated or contradictory to FHA enforcement.

229.    The FY2025 and FY2026 NOFOs must be declared unlawful and set aside as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

### Count IV
### Administrative Procedures Act, 5 U.S.C. § 706(1)
### Unreasonable Delay

230.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

231.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

232.    HUD has not provided FY2025 funding for ongoing multi-year PEI grants.

233.    HUD is refusing to negotiate the second and third years of ongoing grants, which is creating funding gaps even though the multi-year awards were designed to provide year-to-year stability.

234.    HUD has not disclosed whether it will even fund the ongoing grants before September 30, 2026, meaning that the funding gaps may last more than a year.

55

235.    HUD's failure to administer the ongoing PEI awards, both through its funding allocation and through its withholding of negotiations, is agency action unreasonably delayed and unlawfully withheld.

236.    This Court can compel HUD to negotiate and finalize second- and third-year funding for ongoing PEI awards.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

a.  Declare the FY2025 and FY2026 NOFOs unlawful under the APA;

b.  Vacate and set aside the FY2025 and FY2026 NOFOs;

c.  Order HUD to use FHIP funds in a manner consistent with the law;

d.  Order the FY2025 FHIP appropriation to remain available after September 30, 2026;

e.  Utilize the FY2025 FHIP appropriation to fund second and third years of multi-year FHIP PEI grants and expeditiously negotiate ongoing multi-year FHIP PEI grants to ensure the funds are obligated before September 30, 2026;

f.  Award Plaintiffs their costs and reasonable attorneys' fees; and

g.  Order such additional relief as this Court deems just and appropriate.

Dated: July 23, 2026                                Respectfully submitted,

*/s/ Tara K. Ramchandani*
Tara K. Ramchandani (BBO #672351)
Nicholas Abbott*
Reed Colfax*
Lila Miller*
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
tramchandani@relmanlaw.com
nabbott@relmanlaw.com

56

rcolfax@relmanlaw.com
lmiller@relmanlaw.com

*Counsel for Plaintiffs*

\**Pro hac vice* application filed
contemporaneously